IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL LUNDY, | ) | CASE NO. 3:16 CV 1727 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| NEIL TURNER, | ) | JONATHAN D. GREENBERG |
| Warden | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the undersigned pursuant to Local Rule 72.2.  Before the Court is

the Petition of Michael Lundy ("Lundy" or "Petitioner"), for a Writ of Habeas Corpus filed

pursuant to 28 U.S.C. § 2254.  Lundy is in the custody of the Ohio Department of Rehabilitation

and Correction pursuant to journal entry of sentence in the case *State v. Lundy*, Allen County

Common Pleas Court Case No. CR 2012 0236.  For the following reasons, the undersigned

recommends that the Petition be DISMISSED.

### I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

of a state court, factual determinations made by state courts are presumed correct unless rebutted

by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695

F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The

state appellate court summarized the facts underlying Lundy's conviction as follows:

> {¶ 3} The State's first witness was Albert Hammond ("Hammond").
> Hammond testified that he lived with his girlfriend, the victim, in Lima.  Tr.
> 201.  According to Hammond, he was sitting on the porch of their house when
> a man came up and started speaking to him.  Tr. 212.  Hammond did not know
> the man, but thought he might be a friend of the victim, so he continued to
> chat with him.  Tr. 214.  The man was wearing denim shorts and a white or
> cream colored shirt.  Tr. 214.  Hammond spoke to the man for approximately
> five minutes until the victim returned.  Tr. 214.  When the victim returned, she
> went in the house to put the beer away and Hammond followed her.  Tr. 215.
> At that point, they realized that neither of them knew this man.  Tr. 215.
> When they went back out onto the porch, the man was standing on the porch.
> Tr. 215.  Hammond told him to leave and the man started walking away.  Tr.
> 216.  Hammond followed him to the screen door, and the man turned around
> and struck Hammond.  Tr. 216.  Hammond testified that the man repeatedly
> struck him and Hammond fell to the ground.  Tr. 217.  Hammond could hear
> the victim on the porch telling the man to stop.  Tr. 218.  Soon after
> Hammond hit the ground, he lost consciousness.  Tr. 218.
>
> {¶ 4} When Hammond came to, he did not see the victim or the man.  Tr. 218.
> Hammond then tried to go in the house, but the door was locked.  Tr. 218.
> Hammond then went to the victim's mother's home and reported that the man
> had taken the victim.  Tr. 218.  An ambulance was called and Hammond went
> to the hospital while the victim's family went to find her.  Tr. 219.  Later,
> Hammond saw the victim at the hospital.  Tr. 223.
>
> {¶ 5} The next witness for the State was Mark Prinzi ("Prinzi"), who is related
> to the victim.  Tr. 226.  On the evening in question, he was in the house when
> there was a knock on the door.  Tr. 231.  When Prinzi opened the door,
> Hammond was standing there with blood running from his mouth and he
> appeared to be anxious.  Tr. 232.  When he learned that something had
> happened to the victim, he called for his wife to care for Hammond and he
> went to find the victim.  Tr. 232.  When he got to the house, the door was
> locked.  Tr. 232.  His wife eventually joined him, they broke into the house,
> and searched the house for the victim, but she was not there.  Tr. 233–34.
> They left the house and the victim's neighbor, Doug Moneer ("Moneer") came
> out.  Tr. 234.  Prinzi and Moneer then went looking down the street for the
> victim.  Tr. 235.  They proceeded to go towards the riverwalk.  Tr. 238.  Just
> when they were about to turn around and look in a different area, Moneer
> spotted the victim with a man, and Prinzi yelled her name.  Tr. 240.  The man
> pushed away from the victim then and took off running along the riverwalk.

2

Tr. 240–41.  The victim turned toward them and was pulling her pants up.  Tr. 242.  Prinzi testified that the victim did not look like herself because her face was swollen.  Tr. 242.  The person who ran away was a male, but Prinzi did not see his face.  Tr. 243.  When the victim got to them, she said that "he raped me" and Moneer then called 9–1–1.  Tr. 243.  The police and ambulance arrived soon after and the victim was taken to the hospital.  Tr. 244–45.  Once the victim was in the light, Prinzi saw that her "face was completely distorted, swelled out, her jaw was way out here, it just didn't look like her."  Tr. 245.

{¶ 6} While the EMT's were treating the victim, Prinzi and Moneer were speaking with the police.  Tr. 245.  During the discussion, Moneer saw the man that he identified as the attacker walking down the street and notified the police.  Tr. 245.  Prinzi described the man he saw with the victim as wearing a white tank-type T-shirt.  Tr. 249.

{¶ 7} Moneer was the third witness for the State.  Moneer testified that he lived next door to the victim and had known her for years.  Tr. 261.  On June 21, 2012, Moneer was in his house watching the final game of the NBA finals with his girlfriend and his children.  Tr. 262.  His girlfriend told him that she had seen the victim and a guy walking past the window towards the girlfriend's truck, so Moneer went to the door to see what was happening.  Tr. 263.  Moneer saw the victim leaning on the truck and an unknown black man was pulling her away.  Tr. 264.  He heard the victim say "Get away", but he thought she was drunk and he was just pulling her back to the party, so he went back in his house.  Tr. 264.  As the victim was walking away, Moneer's girlfriend told him that the victim's face was bleeding, so Moneer got back up and put on his shoes.  Tr. 265.  By the time he got back outside, Prinzi came running up looking for the victim.  Tr. 267.  Prinzi and Moneer then went to find the victim.  Tr. 268.

{¶ 8} Moneer testified that he grabbed his big flashlight and he and Prinzi started walking towards the river.  Tr. 268.  After they had gone three-fourths of the distance, Prinzi wanted to turn around, but Moneer suggested they just go all the way down.  Tr. 268.  Moneer shined his light down by the bridge and saw two people.  Tr. 268.  He recognized the woman as the victim and started running towards her.  Tr. 269.  As he got closer, he could see a man "raping her from behind."  Tr. 269.  When the man heard them coming, he pushed the victim away, picked up his shorts, and ran away.  Tr. 270.  The man ran towards Central Avenue along the riverwalk.  Tr. 270.  Once Prinzi and Moneer reached the victim, she kept repeating that the man had been raping her.  Tr. 271.  Moneer then called 9–1–1 and requested an ambulance and the police.  Tr. 271.  Moneer was able to give the officers a description of the man he saw.  Tr. 272.  While speaking to the officers, Moneer looked up

3

at the people and saw the man he had previously seen.  Tr. 273.  He pointed him out to the police officer.  Tr. 273.  The officer then called for assistance in apprehending the man as he could not leave the scene.  Tr. 276.  Moneer testified that he identified the man because he was wearing the same pants, shirt, and shoes, and was the same height.  Tr. 275.  Moneer testified that he "just knew that's him."  Tr. 275.

{¶ 9} On cross-examination, Moneer testified that he was able to recognize the victim immediately, but he did not know the man.  Tr. 285.  On redirect, Moneer identified the assailant's shorts as being black denim shorts.  Tr. 293. The man was carrying a white shirt in his hand when he ran off.  Tr. 293.

{¶ 10} Patrolman George Caldwell ("Caldwell") of the Lima Police Department was the fourth witness to testify for the State.  Tr. 296.  Caldwell testified that on June 21, 2012, he was dispatched to the 200 block of South Jackson Street in reference to an assault.  Tr. 297.  He was dispatched at around 10:00 p.m.  Tr. 297.  When he arrived, the victim was sitting on the street being treated by the paramedics and a witness.  Tr. 297.  Caldwell testified that he took a statement from Moneer.  Tr. 298.  Moneer told him that the assailant was a black male who was wearing denim shorts and carrying a white t-shirt.  Tr. 298.  As Caldwell was speaking to Moneer, Moneer told him that he had just seen the man walking on Eureka Street after crossing Jackson Street.  Tr. 299.  Caldwell then radioed that a possible subject was heading east and provided a description of the clothing he was wearing.  Tr. 300–301.  The description of the clothing was provided to Caldwell by Moneer prior to Moneer seeing the man walking on Eureka Street.  Tr. 301. Caldwell then learned that another patrolman had approached the defendant and he ran before being apprehended.  Tr. 301.  Caldwell did not go after the suspect, but instead went to the hospital with the victim.  Tr. 301.

{¶ 11} At the hospital, Caldwell was able to get information from the victim, which he passed on to the detectives.  Tr. 303.  Caldwell also confiscated the victim's clothing and the linens from the ambulance as evidence.  Tr. 303. Caldwell identified State's Exhibit 3 as the underwear taken from the victim. Tr. 305.

{¶ 12} The next witness for the State was Patrolman Shane Huber ("Huber") of the Lima Police Department.  Tr. 310.  On the night of June 21, 2012, Huber was assigned to street patrol.  Tr. 311.  On that night, Huber received a description of a suspect in a rape case.  Tr. 312.  The description of the suspect was that he was wearing shorts and carrying white t-shirt in his hands. Tr. 312.  At the intersection of Pine and Eureka, Huber saw an individual that matched that description.  Tr. 313.  That individual was walking east when Huber saw him.  Tr. 313.  Huber then shined his spotlight on Lundy and told

4

him to stop.  Tr. 314.  The individual then ran away by going through yards and attempting to evade capture.  Tr. 314.  Huber chased the man for three to four blocks before apprehending the man.  Tr. 315.  When Huber caught him, the man was carrying a white t-shirt and was wearing shorts.  Tr. 316.  The individual was transported to the station and his clothing was confiscated as potential evidence.  Tr. 317.  The individual was identified as Lundy.  Tr. 313.

{¶ 13} Huber identified State's Exhibit 7 as a "white tank undershirt" taken from Lundy.  Tr. 318.  State's Exhibit 8 was identified as a pair of denim shorts also taken from Lundy.  Tr. 318.  State's Exhibit 9 was identified as a pair of Hanes striped boxer shorts taken from Lundy.  Tr. 319.  Huber also identified State's Exhibit 11 as a white t-shirt that had been in Lundy's hands when he was apprehended.  Tr. 319.

{¶ 14} Patrolman Jason Warren ("Warren") of the Lima Police Department testified that he transported Lundy to the station after he was arrested by Huber.  Tr. 330.  When he arrived, Lundy was holding a white t-shirt in his hands.  Tr. 33.  The t-shirt was placed in a bag in the trunk of his cruiser.  Tr. 330.  Once he arrived at the station, the bag was turned over to Huber and Lundy was placed in a holding room.  Tr. 331.  While processing Lundy, Warren noted that the zipper on Lundy's shorts was down.  Tr. 332.

{¶ 15} Patrolman Zack Leland ("Leland") of the Lima Police Department testified that he was working the desk when Lundy was at the station.  Tr. 335.  He was assigned to watch Lundy in the bathroom.  Tr. 335.  When he arrived in the restroom, Lundy was using wadded up toilet paper to rub his nose and face area.  Tr. 337.  After Lundy had finished using the restroom, he started washing his hands and face before Leland stopped him.  Tr. 337.  Leland documented that Lundy had been able to possibly destroy evidence in a report.  Tr. 338.

{¶ 16} Officer Michael Carmen ("Carmen") was the eighth witness for the State.  Carmen testified that he is an Identification Officer for the Lima Police Department.  Tr. 346.  On June 21, 2012, he received a call at approximately 10:15 to respond to a crime scene.  Tr. 349.  He went to the two hundred block of South Jackson near the riverwalk.  Tr. 350.  Carmen started processing the scene by taking photographs.  Carmen testified that they found an open condom wrapper and a white towel with what appeared to be blood on it at the scene.  Tr. 356.  After processing the scene under the bridge, Carmen went up to the victim's home to process that scene.  Tr. 359.

{¶ 17} Like the scene by the riverwalk, Carmen started processing the scene at the house by taking multiple photographs.  Tr. 360.  At the house, Carmen observed drops of blood on the metal black iron railing and on the cement.

5

Tr. 362.  Carmen noted that the window was no longer in place as it had been removed.  Tr. 366.  Carmen noted that there was a blood smear on the door frame leading into the kitchen.  Tr. 367.  While working the scene, Carmen's attention was brought to footprints in the alley behind the home.  Tr. 371. Carmen took casts of the prints and compared them to Lundy's shoes, but they did not appear to match.  Tr. 373.

{¶ 18} When Carmen returned to the station, he began processing evidence from Lundy.  Tr. 374.  Carmen took swabs from Lundy's penis, and the swabs were identified as State's Exhibit 1.1.  Tr. 374–75.  State's Exhibit 1.3 were swabs from Lundy's right hand and Exhibit 1.4 were swabs from Lundy's left hand.  Tr. 377.  State's Exhibit 1.5 was a buccal swab to obtain a DNA standard from Lundy.  Tr. 377.

{¶ 19} The ninth witness for the State was the victim.  The victim testified that on the night of June 21, 2012, she and Hammond were sitting on the front porch, listening to music, and drinking beer.  Tr. 409.  Around 9:00 p.m., the victim left with a relative to get more beer.  Tr. 410.  When she got back from the carryout, she walked from the relative's home to hers carrying the beer. Tr. 410.  The victim saw a man standing on the front porch talking to Hammond, but she did not know the man.  Tr. 411.  The victim then went in the house to put the beer away and asked Hammond, who had followed her into the house, who the man was.  Tr. 411.  They realized that neither of them knew him.  Tr. 411.  They returned to the porch and continued talking, but the man started giving her odd looks.  Tr. 411.  Hammond then asked him to leave and a fight started.  Tr. 412.  The man punched Hammond while on the steps and the fight continued into the yard.  Tr. 413.  The victim kept telling the man to quit hitting Hammond.  Tr. 413.  The man then turned and started punching the victim in the face while she was outside.  Tr. 413, 415.  The victim identified the man who struck her and Hammond as Lundy.  Tr. 414. The victim then tried to run away to a neighboring home when Lundy struck her again, grabbed her by the arm and started to drag her up the steps toward the house.  Tr. 415.  Lundy took her into the home, but when he turned to lock the door, the victim ran towards the back door to try and escape.  Tr. 415.  The victim testified that she got as far as the neighbor's drive before Lundy grabbed her again and punched her a couple more times.  Tr. 416.

{¶ 20} After Lundy caught the victim, he began dragging her toward the riverwalk.  Tr. 416.  The victim attempted to escape again, but was too disoriented from the blows to be successful.  Tr. 416–17.  Lundy then took her to beneath the railroad overpass on the riverwalk.  Tr. 417.  The victim testified that Lundy pulled down her pants and had intercourse with her.  Tr. 418.  When she started crying, Lundy threatened to strike her again and then forced her to engage in anal sex.  Tr. 418.  The victim testified that she then

6

heard Prinzi calling her and saw the flashlight.  Tr. 418.  Lundy then pulled away from her and she started running towards Prinzi.  Tr. 418.  The victim testified that while Lundy was doing this, she was crying.  Tr. 420.  When Prinzi was coming towards her, Lundy took off running in the opposite direction.  Tr. 421.  The victim looked over and saw Prinzi and Moneer coming towards her, so she tried to pull up her pants and get to them.  Tr. 422.  The victim testified that she told them that Lundy had raped her.  Tr. 422.

{¶ 21} After the ambulance and police arrived, the victim was taken to the hospital.  Tr. 422.  At the hospital, a sexual assault examination was completed and photographs were taken of the victim's injuries.  Tr. 4287.  The victim identified State's Exhibits 39–47 as photographs of her taken that night.  Tr. 429.  The photographs showed the injuries to her head and face, the bruising to her hand, scratches on her arms and legs, and bruising on her legs.  Tr. 429–32.  Prior to the incident, the victim's body did not have those injuries.  Tr. 432.  The victim was discharged from the hospital and went to a relative's home.  Tr. 433.

{¶ 22} At the relative's home, a police detective brought her a file with six different mug shots.  Tr. 433.  The victim testified that she identified the picture of Lundy as her attacker.  Tr. 433.  The victim testified that she was positive which person was the assailant as soon as the detective set the pictures down.  Tr. 434.

{¶ 23} On cross-examination, the victim admitted that she had been drinking that evening.  Tr. 435.  She estimated that she had drank six beers and Hammond had drank approximately ten or eleven beers before she went to the carryout for more.  Tr. 436.  The victim was shown the photo line-up at around 4:00 a.m.  Tr. 443.  The victim admitted that she only looked at the photo line-up for around two seconds before identifying Lundy.  Tr. 444.  On redirect, the victim testified that she had gotten a good look at her assailant.  Tr. 445.

{¶ 24} The next witness for the State was Detective Sean Neidemire ("Neidemire") of the Lima Police Department.  Tr. 446.  Soon after 10:00 p.m. Neidemire received a call to respond to the scene of a rape.  Tr. 448–49.  Before going to the scene, he went to the hospital, spoke to the victim, and took photographs of injuries.  Tr. 449.  Neidemire then went to the scene and checked in with Carmen to see if he needed assistance.  Tr. 451.  No assistance was needed, so he did not assist in gathering evidence.  Tr. 451.  Neidemire then returned to the police station and assembled a photo line-up.  Tr. 451.  Neidemire identified State's Exhibit 71 as the photo line-up that he prepared.  Tr. 452.  Neidemire then testified to the procedure he used to make the line-up.  Tr. 452–53.  At around 2:45 a.m., Neidemire went to see the

7

victim and showed her the photo line-up he had prepared.  Tr. 456–57.  After he told the victim that the suspect may or may not be in the photos, he set the line-up down on the table.  Tr. 457.  The victim then pointed to the photo of Lundy and said "That's him, that's the man who assaulted me and that's the man that raped me."  Tr. 457.  There was no hesitation on the part of the victim in identifying Lundy as the assailant.  Tr. 457.  The photo identified was a photo of Lundy.  Tr. 458.  Prior to showing the victim the line-up, Neidemire did not tell the victim anything about the suspect or even that they had one.  Tr. 459.

{¶ 25} Christina Umfleet ("Umfleet") testified that she is a registered nurse at Lima Memorial Hospital and works in the emergency room.  Tr. 485–86.  The victim was brought into the emergency room by the paramedics for an alleged assault.  Tr. 487.  When the victim arrived, Umfleet noticed that her face was "swollen, bruised, and bloody, kind of unrecognizable to be a normal person by her face."  Tr. 488.  The victim was able to communicate, but her face and jaw were so swollen that she could barely open her mouth.  Tr. 488.  When questioned, the victim indicated that she had been sexually assaulted.  Tr. 490.  Umfleet testified that although she is not a certified Sexual Assault Nurse Examiner, there was not one on duty at the time, so she did the exam and followed the instructions on the rape kit.  Tr. 493–94.  Umfleet testified that she completed every step that pertained to the victim.  Tr. 499.  When Umfleet questioned the victim, the victim told her that there had been vaginal and anal penetration by the suspect's penis.  Tr. 500–501.

{¶ 26} The next witness was Detective Scott Leland ("Det.Leland") of the Lima Police Department.  Tr. 515.  Det. Leland testified that he was called at home to help investigate a crime at approximately 10:00 p.m. on June 21, 2012.  Tr. 516.  After learning the basics of what had happened while at the station, Det. Leland went to the hospital to speak with the victim and Hammond.  Tr. 518.  Det. Leland spoke with Hammond first, who appeared intoxicated, but was also bloody and "pretty beat up."  Tr. 519.  Hammond was very upset that he had not been able to protect the victim.  Tr. 519.  Then Det. Leland spoke to the victim, who was "banged up" and appeared to be in pain.  Tr. 520.  The victim told him that she did not know her assailant.  Tr. 520.  She was able to give him a basic overview of what had happened, including that she had been physically assaulted, dragged into the house, dragged down to the riverwalk, and sexually assaulted both vaginally and rectally.  Tr. 521.

{¶ 27} From the hospital, Det. Leland went to the riverwalk and the house to get a view of the scene.  Tr. 521.  He testified that he did not touch anything at the scenes and did not spend much time there.  Tr. 522.  While walking the crime scene, it occurred to him that a new shift had come on and he wanted to

8

make sure that they were aware that Lundy could not be given the ability to "wash up." Tr. 523.  He called the station to tell them, but learned it was too late.  Tr. 523.

{¶ 28} Back at the station, Det. Leland prepared an affidavit for a search warrant of Lundy's person.  Tr. 523.  The warrant was issued by a judge the morning of June 22, 2012.  Tr. 527.  At that time, Carmen obtained the evidentiary samples from Lundy.  Tr. 527.  Det. Leland testified that numerous pieces of evidence were submitted to the Ohio Bureau of Criminal Identification and Investigation ("BCII") for tests for blood and DNA analysis.  Tr. 532–34.

{¶ 29} Julie Cox ("Cox") is a forensic scientist at BCII and is assigned to the forensic biology unit.  Tr. 562.  She examines evidence submitted for the presence of bodily fluids, such as blood, semen, and saliva.  Tr. 563.  Cox identified State's Exhibit 63 as her report dated June 29, 2012.  Tr. 567.  Cox testified there was no blood on the penile swabs or right hand swabs taken from Lundy, but there was blood present on the left hand swab.  Tr. 571–76.  The swabs indicated that no semen was present on the vaginal or anal swabs of the victim.  Tr. 578–79.  An examination of the victim's underwear was also negative for the presence of semen.  Tr. 584.

{¶ 30} Cox also identified State's Exhibit 65 as her report from September 14, 2012.  Tr. 586.  For this report, Cox was asked to examine a small towel or washcloth, a shirt from Lundy, and shorts from Lundy for the presence of blood.  Tr. 586.  All three of the items tested positive for the presence of blood.  Tr. 589, 592, and 593.  Cox then took samples and sent them for DNA testing.  Tr. 594.

{¶ 31} The third report completed by Cox was done on October 1, 2012, and identified as State's Exhibit 66.  Tr. 597.  The item examined for blood in this report was Lundy's boxer shorts.  Tr. 597.  The boxer shorts tested positive for blood in the fly area.  Tr. 598–99.  The stain was submitted for DNA testing.  Tr. 599.  On cross-examination, Cox admitted that she did not test every piece of evidence.  Tr. 606, 612.

{¶ 32} The final witness for the state was Sarah Smith ("Smith"), a forensic scientist for BCII in the DNA section.  Tr. 632.  Smith identified State's Exhibits 64 and 67 as her reports.  Tr. 644.  The date on State's Exhibit 64 was August 29, 2012.  Tr. 644.  The date on State's Exhibit 67 as November 1, 2012.  Tr. 645.  State's Exhibit 64 was the results of DNA testing of the swabs from Lundy, the rape kit of the victim, and DNA standards from Lundy, the victim, and Hammond.  Ex. 64.  The results indicated that the DNA profile from the penile swabs was a mixture consistent with contributions from

Lundy and the victim. Tr. 646. The statistical weight was that there was a 1 in 12,610 chance that the DNA found came from the victim and Lundy. Tr. 649.

{¶ 33} Smith's report labeled State's Exhibit 67 analyzed DNA samples from the rape kit of Lundy, the rape kit of the victim, the cloth found on the riverwalk, the shirt taken from Lundy, the shorts taken from Lundy, and the underwear taken from Lundy. Ex. 67. Smith testified that the blood stain on the cloth came from the victim. Tr. 655. The expected frequency occurrence of the DNA profile coming from someone other than the victim was one in four hundred sixty-two quintillion, five hundred quadrillion (462,500,000,000,000,000,000). Tr. 655. The blood stains from the shirt were consistent with the DNA profile of Hammond as well as Lundy. Tr. 657–58. The odds of those blood stains coming from anyone other than Hammond and Lundy were one in sixteen quintillion, seven hundred-thirty quadrillion (16,730,000,000,000,000,000). Tr. 658. Smith testified that the population of the world is approximately seven billion, so she would not expect to see the profile she found in another individual. Tr. 659. The test results for the swabs taken from the outside of the shorts indicated that a DNA mixture was found belonging to Lundy and the victim. Tr. 660–61. The likelihood that the mixture came from anyone other than Lundy and the victim was one in thirty-one million, eight hundred eighty thousand (31,880,000). Smith also tested the DNA swabs from Lundy's underwear. Tr. 662–63. The tests revealed a mixture consistent with Lundy and the victim being the source. Tr. 663. The statistical weight of this test was one in two thousand, three hundred and fifty-seven (2,357). Tr. 663.

{¶ 34} The State then questioned Smith concerning the reports from Lundy's independent DNA examination of the samples. Tr. 665–78. Smith had prepared a report comparing the test results from BCII to those from the DNA Diagnostics Center ("DDC") and it was identified as State's Exhibit 69. Tr. 679. The chart was a summary of the results. Tr. 680. DDC's report could not exclude the victim as a source of the DNA found on the penile swabs. Tr. 681–82. Smith testified that although her tests excluded the victim and Hammond as sources of DNA on the swab from Lundy's left hand, the DDC tests did not exclude the victim as a source. Tr. 685. Additionally, the statistical weights to be assigned to the tests were different in various tests. Tr. 686. In general, the report from DDC was not inconsistent with that of BCII. Tr. 686.

{¶ 35} On cross-examination, Smith testified that the higher the statistical weight, the higher the confidence in the conclusion is. Tr. 692. The statistics mean nothing other than the level of confidence in the result. Tr. 699. Smith also testified that she did not know what equipment DDC was using for

10

testing.  Tr. 697.  She also testified that she did not know the quality of the samples tested by DDC.  Tr. 697–98.  Smith explained on redirect that the results may depend on where the swab was taken from the sample as not every portion of a sample will have the same amount of DNA.  Tr. 703.  Following this testimony, the State rested its case.  Tr. 707.

{¶ 36} Lundy presented the testimony of one witness during his case-in-chief.  Stacy Martin ("Martin"), who works for DDC.  Tr. 714.  Martin identified State's Exhibits 68 and 68a as reports that she prepared and that they were dated August 8, 2013.  Tr. 718.  Martin testified that 68a was a supplement to 68 because some of the statistical results were changed as a result of clerical error.  Tr. 719–21.  Martin testified that she was hired by Lundy to conduct independent DNA testing on various items also tested by BCII.  Tr. 722.  Tests were run on the penile swab, Lundy's left hand swab, two stains from Lundy's shorts, one stain from Lundy's underwear, and the three reference standards.  Tr. 723.  As for the penile swab, the testing revealed that for the non-sperm fraction of the DNA, Martin identified a mixed profile from which Lundy, the victim and a third party could not be excluded.  Tr. 725.  The statistical weight given to this conclusion was one in ninety-seven (97).  Tr. 725.  Martin testified that this number was not very high.  Tr. 725.

{¶ 37} Next, Martin tested the samples taken from the left hand swab of Lundy.  Tr. 725–26.  The test results indicated that DNA consistent with that of Lundy as the major contributor and the victim as a minor contributor was present.  Tr. 726–27.  The statistical weight given to the possibility of someone other than the victim being a minor contributor was put at one in twenty-one (21) individuals.  Tr. 727.

{¶ 38} The third item tested by DDC was two stain samples from Lundy's shorts.  Tr. 727.  A review of the non-sperm faction of the stains indicated that two or more individuals contributed DNA to the sample.  Tr. 728.  Martin testified that Lundy and the victim could not be excluded as contributors.  Tr. 728–29.  The statistical probability of other individuals contributing was placed at one in one hundred and seventy thousand (170,000).  Tr. 729.  According to Martin, this does not rise to the level of "scientific reasonable certainty" because to reach that level "you'd have to exceed the population of the earth, which is approximately seven billion."  Tr. 729.  The second stain was also tested.  Tr. 729.  In the non-sperm fraction of the stain, the tests revealed a mixture of three or more contributors.  Tr. 730.  Lundy and the victim could not be excluded as contributors to the mixture.  Tr. 730.  The statistical probability of a random person being a contributor was "approximately one in forty-four" (44) individuals.  Tr. 730.

{¶ 39} The last item tested by Martin was a stain from Lundy's underwear.

11

Tr. 731. The non-sperm fraction again showed a mixture of three or more individuals. Tr. 731. Lundy and the victim could not be excluded as contributors. Tr. 731. The statistical weight assigned was one in two hundred and sixty (260) individuals. Martin testified that this is a very low level of confidence. Tr. 731. Martin also testified that although her statistics differed from those of BCII, the results were consistent. Tr. 734. Martin's conclusion was that she could not say with scientific certainty that the victim was a contributor to the DNA mixture found on the underwear. Tr. 736–37. Martin also testified that any probability below one in seven billion was not scientifically certain. Tr. 737.

{¶ 40} On cross-examination, Martin testified that she had reviewed BCII's results. Tr. 767. After reviewing BCII's reports, Martin had no reason to believe that BCII's results were incorrect. Tr. 767–68. Martin agreed that although the statistical weight may be different, the conclusion whether to exclude or not was the same. Tr. 768. Following this testimony, Lundy rested.

*State v. Lundy*, No. 1-13-52, 2014 WL 5803035, at *1-9 (Ohio Ct. App. Nov. 10, 2014).

## II. Procedural History

### A.      Trial Court Proceedings

On August 16, 2012, the Allen County Grand Jury indicted Lundy on the following charges:  two counts of rape in violation of Ohio Rev. Code § 2907.02(A)(2); one count of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(4); and one count of aggravated burglary in violation of Ohio Rev. Code § 2911.11(A)(1).  (Doc. No. 7-1, Exh. 1.)  Lundy entered pleas of not guilty to all charges.  (Doc. No. 7-1, Exh. 4.)

On September 18, 2012, Lundy filed a motion to suppress photo and in-court identifications.  (Doc. No. 7-1, Exh. 2.)  The trial court denied the motion.  (Doc. No. 7-1, Exh. 3.)

The case proceeded to a jury trial on August 6, 2013.  (Doc. No. 7-1, Exh. 4.)  On August 9, 2013, the jury returned its verdict, finding Lundy guilty of all charges.  (*Id.*)

12

On September 9, 2013, the trial court held a sentencing hearing.  (Doc. No. 7-1, Exh. 5.) It sentenced Lundy to eleven years imprisonment for each rape charge and nine years imprisonment each for the kidnapping and aggravated burglary charges, with all prison terms to be served consecutively, for an aggregate sentence of forty years in prison.  (Doc. No. 7-1, Exh. 5.)  The court also designated Lundy a Tier 3 Sex Offender.  (Doc. No. 7-1, Exhs. 5, 6.)

**B.** **Direct Appeal**

Lundy, through the same counsel, filed a timely notice of appeal to the Third District Court of Appeals.  (Doc. No. 7-1, Exh. 7.)  In his appellate brief, he raised the following assignments of error:

1. The trial court committed error in not merging the offenses of two counts of rape, aggravated burglary and kidnapping.

2. The trial court committed error in not granting the Defendant's challenge to the preemptory strike of an African[-]American female from the jury.

3. The Defendant's convictions were against the manifest weight of the evidence and based upon insufficient evidence.

4. The Defendant's sentence is contrary to law.

(Doc. No. 7-1, Exh. 8 (capitalization altered).)  The State filed a brief in response.  (Doc. No. 7-1, Exh. 9.)

On May 9, 2014, Lundy filed a *pro se* "Motion to Strike Counsel and Merit Brief." (Doc. No. 7-1, Exh. 10.)  The appellate court granted Lundy's request for new counsel, denied his request that his counsel's original appellate brief be stricken, and permitted new counsel to file a supplemental brief.  (Doc. No. 7-1, Exh. 11.)  In a supplemental appellate brief, Lundy, through new counsel, added the following assignment of error:

5. The Defendant received ineffective assistance of counsel.

(Doc. No. 7-1, Exh. 12.)  The State filed a brief in response.  (Doc. No. 7-1, Exh. 13.)

On November 10, 2014, the Ohio appellate court affirmed the trial court's judgment.

(Doc. No. 7-1, Exh. 14.)  Lundy, acting *pro se*, moved for reconsideration.  (Doc. No. 7-2, Exh.

15.)  The court of appeals denied the motion.  (Doc. No. 7-2, Exh. 16.)

Lundy, again acting *pro se*, filed a timely notice of appeal of the appellate court's

judgment to the Ohio Supreme Court.  (Doc. No. 7-2, Exh. 17.)  In his memorandum in support

of jurisdiction, he set forth the following propositions of law:

> 1.    Whether an appellate court can legally rule that a defendant's offenses should not be merged when the defendant's actions are based on one ongoing course of conduct, pursuant to O.R.C 2941.25(A)?
>
> 2.    Whether a defendant's fourteenth amendment constitutional rights have been violated when the [trial court] does not properly engage in the three-step process that Batson provides [a trial court] to use in adjudicating a claim that a peremptory challenge was based on race, pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986)?
>
> 3.    Whether a defendant can legally be convicted of the offense of rape when experts for both the State and the Defense, at trial, state that they could not within a reasonable degree of scientific certainty, say that the DNA that was obtained was that of the victim or the potential attacker?
>
> 4.    Whether a defendant's sentence can stand on its face when the sentence is virtually contrary to law, pursuant to O.R.C 2941.25(A)?
>
> 5.    Whether a defendant receives ineffective assistance of counsel pursuant to the sixth amendment of the U.S. Constitution, when his attorney's admissions during opening and closing statements reflect an unreasonable trial strategy?

(Doc. No. 7-2, Exh. 18 at 23.)

The Ohio Supreme Court declined jurisdiction over the appeal on April 29, 2015.  (Doc.

No. 7-2, Exh. 19.)  Lundy filed a *pro se* motion for reconsideration on May 6, 2015, which the

court denied.  (Doc. No. 7-2, Exhs. 20, 21.)

### C. Application to Reopen Appeal under Ohio App. R. 26(B)

On January 30, 2015, Lundy filed a *pro se* application to reopen his direct appeal pursuant to Rule 26(B) of the Ohio Rules of Appellate Procedure.  (Doc. 7-2, Exh. 24.)  He claimed his appellate counsel was ineffective for failing to raise the following assignments of error on direct appeal:

1. Whether Mr. Chamberlain [was] ineffective because he failed to raise the issue regarding Mr. Lundy's picture line-up pursuant to [Ohio Rev. Code § 2933.83] double blinded administration[.]

2. Mr. Chamberlain [was] ineffective because he failed to object to the way Mr. Lundy was identified during his trial proceedings[.]

3. Whether Mr. Chamberlain is ineffective because he failed to file a motion to suppress for Mr. Lundy pursuant to Crim. R. 12(C)(3) prior to Mr. Lundy's trial commencing?

4. Whether Mr. Short is ineffective because he failed to raise the issue that Mr. Chamberlain is ineffective because he failed to file a motion to suppress for Mr. Lundy regarding whether Mr. Lundy was indicted in a timely manner while he was incarcerated in the Allen County jail prior to his trial?

5. Whether Mr. Chamberlain and Mr. Short are ineffective because neither attorney has forwarded Mr. Lundy a complete copy of his case file?

6. Whether Mr. Chamberlain and Mr. Short are ineffective for their failure to raise the same issues in Mr. Lundy's Direct Appeal that Mr. Chamberlain raised prior to trial in his ("Motion Contra to the State of Ohio's Motion to Modify Time under Crim. R. 16(K) and to Exclude Testimony of State of Ohio's Expert Due to Violation of that Same Rule.")

(Doc. No. 7-2, Exh. 24 at 74-81 (capitalization altered).)  On March 17, 2015, the state appellate court denied the application as meritless.  (Doc. 7-2, Exh. 25.)

Lundy filed a *pro se* notice of appeal of the appellate court's judgment to the Ohio Supreme Court.  (Doc. 7-2, Exh. 26.)  In his memorandum in support of jurisdiction, he raised the following propositions of law:

15

1.   Whether Mr. Chamberlain [was] ineffective because he failed to raise the issue regarding Mr. Lundy's picture line-up pursuant to [Ohio Rev. Code § 2933.83] double blinded administration[, and] Mr. Chamberlain [was] ineffective because he failed to object to the way Mr. Lundy was identified during his trial proceedings[.]

2.   Whether Mr. Chamberlain [was] ineffective because he failed to file a motion to suppress for Mr. Lundy pursuant to Crim. R. 12(C)(3) prior to Mr. Lundy's trial commencing[, and] because he failed to file a motion to suppress for Mr. Lundy regarding whether Mr. Lundy was indicted in a timely manner while he was incarcerated in the Allen County jail prior to his trial[.]

3.   Whether Mr. Chamberlain and Mr. Short [were] ineffective because neither attorney has forwarded Mr. Lundy a complete copy of his case file[.]

4.   Whether Mr. Chamberlain and Mr. Short are ineffective for their failure to raise the same issues in Mr. Lundy's direct appeal that Mr. Chamberlain raised prior to trial in his ("Motion contra to the State of Ohio's Motion to Modify Time under Crim. R. 16(K) and to Exclude testimony of State of Ohio's Expert due to Violation of that Same Rule.")

(Doc. No. 7-2, Exh. 27 (capitalization altered).)  The court declined jurisdiction over the appeal on July 8, 2015.  (Doc. 7-2, Ex. 28.)

**D.**   **Post-Conviction Filings**

  Meanwhile, Lundy filed in the trial court a *pro se* motion to vacate or set aside the judgment of conviction or sentence on March 5, 2014.[1]  The court denied the motion the next day, on March 6, 2014.  (Doc. No. 7-2, Exh. 23.)  Lundy objected to the court's order.  (Doc. No. 7-2, Exh. 29 at 145.)  The trial court's docket indicates Lundy did not appeal the trial court's judgment.  (Doc. No. 7-2, Exh. 29 at 145.)

---

[1]   Respondent states in the return of writ that the Allen County Clerk of Court was unable to locate Lundy's post-conviction petition in the trial court's files.  (Doc. No. 7 at 14 n.4.)

16

F.     **Federal Habeas Petition**

On July 6, 2016, Lundy, through counsel, filed a Petition for Writ of Habeas Corpus in this Court and asserted the following grounds for relief:

> **GROUND ONE**: The trial court committed error in not granting Lundy's challenge to the preemptory[sic] strike of an African[-]American female from the jury.
>
>> **Supporting Facts**: The prima facie case against Allen County for engaging in exercising of peremptory challanges with a discriminatory purpose has already been established judicially. See State v. Abraham Goode, 2008-Ohio-1651, 1-07-55 (2008), State v. David Evans, 2010-Ohio-4813, 1-10-22 (2010).  In Mr. Lundy's case, then, the state peremptorily challenged the only black juror on the panel, claiming solely am[sic] unexplored suspicion of possible associations with previously prosecuted individuals(s).  The trial court questioned whether the black juror was actually black and whether the previously excused white juror was actually white because of a lack of proof on either issue.  Moreover, the court used a 2-juror peremptory challenge history (the instant two jurors excused) as the pool the analyze and found that 50% of challenges (1 juror) were against ostensibly black jurors but 50% (1 juror) against white jurors, such that no pattern existed.
>
> **GROUND TWO**: Mr. Lundy received the ineffective assistance of trial counsel.
>
>> **Supporting Facts**: Trial counsel conceded all elements of all offenses to the jury, with the sole exception being a failure to concede identity, in the face of a client whose defense was not that he did not do these acts but that the acts were consensual. Trial counsel failed to file a motion to suppress eyewitness identification despite full knowledge that the identification occurred under conditions wherein law enforcement violated State law as to how to conduct a photo array.  Trial counsel did not in any way challenge the constitutionality of Ohio's merger statute and did not secure proper notice and due process as to merger facts.
>
> **GROUND THREE:** Mr. Lundy was denied the effective assistance of appellate counsel.

17

**Supporting Facts:** The transcripts for Mr. Lundy's jury trial are over 900 pages long.  Mr. Short, the second attorney appointed to represent Mr. Lundy, billed all of 5.6 hours to get to the completion of the brief, despite the undersigned and prior counsel Chamberlain requiring about 17 hours, or three times that amount.  Mr. Lundy's first appellate attorney, Mr. Chamberlain, was removed by the Third District Court of Appeals and replaced by Mr. Short when Mr. Lundy noted that Mr. Chamberlain (1) had a conflict of interest precluding him from effectively assessing a possible appeal on the basis of ineffective assistance of counsel, (2) appellate counsel acted in violation of Mr. Lundy's directions, and (3) appellate counsel refused to cooperate or communicate with Mr. Lundy in preparing the appeal.  Mr. Short failed to raised[sic] meritorious issues, including as described in the pro se reopening petition.

**GROUND FOUR:**  Mr. Lundy was denied his right to trial by jury and to due process of law in the handling of Ohio's merger statute and the resulting procedure and findings.

**Supporting Facts:** 11 years were imposed as a result of the act of which Mr. Lundy was convicted.  The remaining 29 years of his sentence is the result of a trial judge making findings of fact concerning questions of merger. Trial counsel did nothing to ensure that these facts were presented to a grand jury, that notice of these facts was given to his client, or that evidence was presented necessary to determine these facts.  Trial counsel did not raise the unconstitutionality of Ohio's merger statute for violation of the right to jury trial and due process.  As a result, both the trial court and the appellate made random findings enabling an additional 29 years in prison.  For example, the trial court deemed two temporarily juxtaposed sexual acts to be separate course of sexual conduct despite any intervening time, and the appellate court arbitrarily divided up a single kidnapping event into a series of separate but temporarily juxtaposed kidnapping events, each in order to artificially create "separate" acts necessary to enable distinct, consecutive sentencing.  Each then arbitrarily decided that the jury verdict must have been based upon the hypothetical artificially-separated act that was not at the same time as another act.

(Doc. No. 1.)

On October 3, 2016, Warden Turner ("Respondent") filed his Return of Writ. (Doc. No.

18

7.)  Lundy filed a Traverse on October 24, 2016.  (Doc. No. 9.)

### III.  Analysis of the Petition

**A.     Exhaustion and Procedural Default**

Respondent argues portions of Ground Two and all of Ground Four are procedurally defaulted because they were never properly presented to the state courts.  (Doc. No. 7 at 25.) Lundy asserts there is cause and prejudice to excuse the default.  (Doc. No. 1 at 8-11.)  He also argues the procedural default of these claims should be excused on the grounds he is actually innocent.  (Doc. No. 9 at 20.)

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.1990).

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).  A claim may become procedurally defaulted in two ways. *Id.*  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.; see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural

19

rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[2]  *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lovins*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")  This second type of procedural default is often confused with exhaustion.  Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition."  *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period,

---

[2] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice."  *Id.* at 138–39; *Barkley v. Konteh*, 240 F. Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)."  *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

procedural default and not exhaustion bars federal court review. *Id.* In Ohio, a petitioner is not

entitled to raise claims in post-conviction proceedings where those claims could have been

raised on direct appeal. *Id.* Thus, if an Ohio petitioner failed to raise a claim on direct appeal,

which could have been raised, the claim is procedurally defaulted. *Id.*

     A claim is adequately raised on direct appeal if it was "fairly presented" to the state

court. To fairly present a claim to a state court a petitioner must assert both the legal and factual

basis for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly,

a "petitioner must present his claim to the state courts as a federal constitutional issue-not

merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir.

1984). A petitioner can take four actions in his brief which are significant to the determination

as to whether a claim has been fairly presented as a federal constitutional claim: (1) reliance

upon federal cases employing constitutional analysis; (2) reliance upon state cases employing

federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms

sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts

well within the mainstream of constitutional law. *Williams v. Anderson*, 460 F.3d 789, 806 (6th

Cir. 2006).

     A petitioner's procedural default, however, may be excused upon a showing of "cause"

for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d

at 138–39. "Demonstrating cause requires showing that an 'objective factor external to the

defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v.

Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488

(1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected

with constitutional error." *Id.* Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219–20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S. 722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). *See also Jones v. Bradshaw*, 489 F. Supp.2d 786, 807 (N.D. Ohio 2007); *Allen v. Harry*, 2012 WL 3711552 at * 7 (6th Cir. Aug. 29, 2012).

### 1. Ground Two: Ineffective Assistance of Trial Counsel

Ground Two of Lundy's Petition alleges claims of ineffective assistance of trial counsel. Specifically, Ground Two alleges trial counsel was ineffective due to (1) "conced[ing] all elements of all offenses to the jury . . . in the face of a client whose defense was not that he did not do these acts but that the acts were consensual;" (2) failing to file a motion to suppress eyewitness identification; and (3) failing to "challenge the constitutionality of Ohio's merger

22

statute and did not secure proper notice and due process as to merger facts."  (Doc. No. 1 at 8.)

Respondent asserts the following portions of Ground Two are procedural defaulted, as Lundy did not raise them on direct appeal: (1) the defense theory the acts were consensual; (2) the failure to file a motion to suppress; and (3) the constitutionality or application of the merger statute in the state courts.  (Doc. No. 7 at 20, 21.)  Respondent further maintains Lundy has not established cause or prejudice to excuse these defaults.  (*Id*. at 22.)

In his Traverse, Lundy concedes "two thirds of Ground Two are either procedurally defaulted or non-cognizable."[3]  (Doc. No. 9 at 18.)  He admits he has not previously raised the issue of consent and acknowledges his arguments regarding the motion to suppress are "either defaulted because Mr. Lundy failed to explain what he meant or because the issues actually articulated are not cognizable because they are State issues."  (*Id.* at 16, 17.)  Lundy does not advance any arguments these procedural defaulted matters are excused due to cause, prejudice, or actual innocence.  Therefore, in the lack of any opposition, the Court finds these two sub-arguments are procedurally defaulted and are dismissed.

Accordingly, as Lundy has conceded the bulk of his Ground Two arguments are defaulted, this Court need only consider the "merger sub-issue" in the context of procedural default.  (*See* Doc. No. 9 at 17-20.)

Here, Lundy raised a claim of ineffective assistance of counsel to the state appellate court, alleging his trial counsel's "decision to concede almost all elements of the crime prejudiced the defendant."  (Doc. No. 7-1, Exh. 12, Tr. 146.)  This claim did not include any

---

[3]      However, Lundy maintains the procedural default of the "merger sub-issue" should be excused.  (*Id*. at 17, 18, 20.)

23

argument regarding trial counsel's failure to "challenge the constitutionality of Ohio's merger statute" or "secure proper notice and due process as to merger facts."  (*See* Doc. No. 1 at 8.) The state appellate court affirmed Lundy's conviction and sentence.  (Doc. No. 7-1, Exh. 14.)

Lundy appealed to the Supreme Court of Ohio, again raising an ineffective assistance of trial counsel claim, based on trial counsel's "decision to concede all of the elements of the crime."  (Doc. No. 7-2. Exh. 18, Tr. 23, 34.)  Lundy again did not raise any argument regarding trial counsel's failure to challenge Ohio Rev. Code §2941.25 (Ohio's multiple counts statute). The Supreme Court of Ohio declined jurisdiction of the appeal.  (Doc. No. 7-2, Exh. 19.)

In his March 2014 post-conviction filing, Lundy raised arguments regarding his indictment and the trial court's jurisdiction.  (Doc. No. 8-2.)  He did not raise any claims of ineffective assistance of counsel.  The state trial court denied the motion.  (Doc. No. 7-2, Exh. 23.)  Lundy did not appeal the trial court's judgment.  (Doc. No. 7-2, Exh. 29 at 145.)

In light of the above, the Court finds the "merger sub-issue" portion of Ground Two is procedurally defaulted.  As noted above, Lundy did not raise any argument regarding trial counsel's failure to challenge Ohio Rev. Code §2941.25 on direct appeal to the state appellate court, nor did he raise this claim in his March 2014 post-conviction filing.  Moreover, Lundy does not direct this Court's attention to, nor is the Court aware of, any additional mechanism in which he can now raise this issue in the state courts.

Accordingly, the Court finds this portion of Ground Two of Lundy's Petition is procedurally defaulted.

### a.       Cause and Prejudice

Lundy may nevertheless obtain a merits review of this claim if he can demonstrate cause

24

for the default and prejudice resulting therefrom, or that failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren,* 440 F.3d at 763.  In his Petition, Lundy argues "trial counsel did not in any way challenge the constitutionality of Ohio's merger statute and did not secure proper notice and due process as to merger facts."  (Doc. No. 1 at 8.)  He explains this argument was "not raised or exhausted properly because appellate counsel was ineffective."  (*Id.*)

The Sixth Circuit has held that cause to excuse the procedural default of a habeas claim may exist if a petitioner's appellate counsel was ineffective in failing to raise the issue.  *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013); *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir.2004); *Smith v. Ohio, Department of Rehab. and Corr.*, 463 F.3d 426, 432 (6th Cir. 2006); *Berry v. Warden, Southern Ohio Correctional Facility*, 2016 WL 4177174 at * 3 (N.D. Ohio Aug. 8, 2016).  However, the underlying claim of ineffective appellate counsel must in and of itself not be in default.  *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (finding unless the state prisoner can satisfy the cause and prejudice standard for the procedurally defaulted ineffective assistance of counsel claim, that claim cannot serve as cause for another procedurally defaulted claim.)

Here, Lundy filed a *pro se* application to reopen his direct appeal pursuant to Ohio App. R. 26(B).  (Doc. 7-2, Exh. 24.)  In his Rule 26(B) application, he raised a claim of ineffective assistance of appellate counsel, arguing counsel "failed to raise any winning issues."  (Doc. No. 7-2, Exh. 24, Tr. 74.)  Specifically, Lundy argued appellate counsel (1) "failed to raise the issue regarding Mr. Lundy's picture line-up;" (2) "failed to raise the issue [trial counsel] is ineffective because he failed to object to the way Mr. Lundy was identified during his trial proceedings;"

(3) "failed to raise the issue that [trial counsel] is ineffective because he failed to file a motion to

suppress for Mr. Lundy;" (4) did not forward him a complete copy of his case file; and (5) failed

to raise issues regarding the DNA evidence, speedy trial, and an expert report.  (*Id.*)  Lundy did

not mention Ohio Rev. Code §2941.25 in his Rule 26(B) application.  The state appellate court

denied Lundy's application.  (Doc. No. 7-2, Exh. 25.)

Lundy appealed to the Supreme Court of Ohio.  (Doc. No. 7-2, Exh. 26.)  He again

argued ineffective assistance of appellate counsel, reiterating the same claims in his initial Rule

26(B) application.  (*Id.*)  Lundy did not reference Ohio Rev. Code §2941.25 in his appeal to the

Supreme Court of Ohio.

The Court finds Lundy has not established cause and prejudice as to the "merger sub-

issue" under Ground Two.  Assuming, *arguendo*, appellate counsel was ineffective in his failure

to raise any issues regarding trial counsel's failure to challenge the constitutionality of Ohio

Rev. Code §2941.25, Lundy did not raise this argument in his Rule 26(B) application.  Thus,

Lundy's ineffective assistance of appellate counsel claim regarding this particular issue is itself

procedurally defaulted and cannot provide cause to excuse the procedural default of this portion

of Ground Two.  *See Edwards*, 529 U.S. at 453.  *See also Barnette v. Bunting,* 2017 WL

1079088 at *3 (N.D. Ohio Mar. 22, 2017).[4]

Accordingly, and for all the reasons set forth above, the Court finds Lundy has failed to

establish cause and prejudice to excuse the default of the "merger" issue in Ground Two.

---

[4]     As discussed *infra*, Lundy has not demonstrated cause or prejudice to excuse the
        default of this sub-argument of ineffective assistance of appellate counsel.

**b.** **Actual Innocence**

Lundy also argues the procedural default of the "merger sub-issue" of Ground Two should be excused on the basis of actual innocence. (Doc. No. 9 at 18, 20.)

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004) (citing *Carrier*, 477 U.S. at 495–96); *see also Schlup*, 513 U.S. at 327 (1995). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623–24, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). To be credible, such a claim requires the petitioner to support his allegations of constitutional error with new and reliable evidence that was not presented at trial. *Schlup*, 513 U.S. at 324; *see also Gulertekin v. Tinnelman–Cooper*, 340 F.3d 415, 427 (6th Cir. 2003).

The crux of Lundy's actual innocence argument is that the state trial and appellate courts should have merged his offenses. (Doc. No. 9 at 19, 20.) However, his argument does not establish "actual innocence." Lundy provides no new, reliable evidence which was not presented at trial. Rather, he reiterates his arguments regarding the application and constitutionality of Ohio Rev. Code §2941.25. Absent new evidence of innocence, "even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 513 U.S. at 316.

In light of the above, the Court finds Lundy has failed to demonstrate the procedural

27

default of the "merger sub-issue" of Ground Two should be excused on the basis of actual innocence.  Accordingly, it is recommended this portion of Ground Two be DISMISSED as procedurally defaulted.

### 2.      Ground Three – Ineffective Assistance of Appellate Counsel

In Ground Three of his Petition, Lundy argues his appellate counsel failed to "allege the ineffectiveness of trial counsel for failing to challenge Ohio's merger statute as unconstitutional."  (Doc. No. 9 at 35.)  As noted *supra*, Lundy filed a *pro se* application to reopen his direct appeal pursuant to Ohio App. R. 26(B).  (Doc. 7-2, Exh. 24.)  In his Rule 26(B) application, he did not argue his appellate counsel was ineffective for failing to challenge Ohio Rev. Code §2941.25 as unconstitutional.  (*See* Doc. No. 7-2, Exh. 24, 27.)  Therefore, because there is no mechanism by which Lundy can now raise this claim in state court, the Court finds this portion of Ground Three to be procedurally defaulted.

Lundy attempts to argue cause exists to excuse this default because he "did not spot this critical issue because he is not a skilled attorney."  (Doc. No. 1 at 10, 11.)  However, the Sixth Circuit has found a petitioner's *pro se* status in the state courts and ignorance of the law is insufficient to establish cause.  *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).  *See also Tolliver v. Sheets*, 530 F.Supp.2d 957, 981 (S.D. Ohio 2009); *Terry v. Warden,* 2016 WL 5477552 at *12 (Mar. 3, 2016.)  Thus, Lundy's *pro se* status and ignorance of various legal arguments cannot serve as cause to excuse the default of this particular habeas claim.  In addition, the Court finds Lundy has not established "actual innocence" because, as discussed *supra*, he has not provided any new, reliable evidence.

Accordingly, the Court finds Lundy has failed to demonstrate the procedural default of

this sub-argument of Ground Three should be excused.  It is therefore recommended this portion of Ground Three be DISMISSED as procedurally defaulted.

### 3.    Ground Four: Ohio Merger Statue

In Ground Four of his Petition, Lundy argues he "was denied his right to trial by jury and to due process of law in the handling of Ohio's merger statute and the resulting procedure and findings."  (Doc. No. 1 at 11.)  He asserts Ohio Rev. Code §2941.25 is unconstitutional as it violates "the right to trial by jury and due process."  (*Id.*)  Respondent maintains this argument is "frivolous," "defaulted," and "not cognizable."  (Doc. No. 7 at 24, 44.)

On direct appeal Lundy raised a claim regarding the merging of his offenses, alleging "the trial court committed error in not merging the offenses of two counts of rape, aggravated burglary and kidnapping."  (Doc. No. 7-1, Exh. 8.)  This claim did not include any argument regarding the constitutionality of Ohio Rev. Code § 2941.25 (Ohio's multiple counts statute). The state appellate court affirmed Lundy's conviction and sentence.  (Doc. No. 7-1, Exh. 14.)

Lundy appealed to the Supreme Court of Ohio, again alleging the trial court erred in not merging his offenses.  (Doc. No. 7-2. Exh. 18.)  Lundy did not raise any issue regarding the constitutionality of Ohio Rev. Code § 2941.25.  The Supreme Court of Ohio declined jurisdiction of the appeal.  (Doc. No. 7-2, Exh. 19.)

In his March 2014 post-conviction filing, Lundy raised a host of arguments regarding his indictment and the trial court's jurisdiction, but did not raise the claim Ohio Rev. Code § 2941.25 was unconstitutional.  (Doc. No. 8-2.)  The state trial court denied the motion.  (Doc. No. 7-2, Exh. 23.)  Lundy did not appeal the trial court's judgment.  (Doc. No. 7-2, Exh. 29 at 145.)

The Court finds the portion of Ground Four which challenges the constitutionality of Ohio Rev. Code § 2941.25 is procedurally defaulted, as Lundy did not raise this issue on direct appeal or in his post-conviction filing and there is no mechanism in state court he may now do so.

### a.    Cause and Prejudice

Similar to Grounds Two and Three, Lundy asserts this procedural default should be excused because of the ineffective assistance of counsel at both the trial and appellate levels, as well as the fact "he is not a skilled attorney."  (Doc. No. 1 at 11.)

As noted *supra*, cause to excuse the procedural default of a habeas claim may exist if a petitioner's appellate counsel was ineffective in failing to raise the issue.  *See Moore*, 708 F.3d at 776 (6th Cir. 2013).  However, the underlying claim of ineffective appellate counsel must in and of itself not be in default.  *See Edwards*, 529 U.S. at 453.

Lundy did not raise any argument regarding his trial counsel or his appellate counsel being ineffective for failing to raise the issue of the constitutionality of Ohio Rev. Code § 2941.25 prior to this habeas Petition.  (*See* Doc. No. 7-1, Exh. 8, 12; Doc. No. 7-2, Exh. 15, 18.) Assuming, *arguendo,* trial and appellate counsel were ineffective in failing to raise any issues regarding the constitutionality of this statute, Lundy failed to raise this argument on both his direct appeal or his Rule 26(B) application.  Thus, Lundy's arguments regarding trial and appellate counsel on this particular issue are themselves procedurally defaulted and cannot provide cause to excuse the procedural default of this portion of Ground Four.  *See Deitz*, 391 F.3d at 809 (6th Cir. 2004).

Lundy also contends cause exists to excuse this default because he "did not spot this

critical issue because he is not a skilled attorney."  (Doc. No. 1 at 11.)  However, as noted

above, a petitioner's *pro se* status in the state courts and ignorance of the law is insufficient to

establish cause.  *Bonilla,* 370 F.3d at 498 (6th Cir. 2004).  Thus, Lundy's *pro se* status cannot

serve as cause to excuse the default of this particular argument.

Accordingly, and for all the reasons set forth above, the Court finds Lundy has failed to

establish cause and prejudice to excuse the default of this sub-argument in Ground Four.

### b.  Actual Innocence

Lundy also claims the procedural default of this argument should be excused on the basis

of actual innocence.  (Doc. No. 9 at 20.)  He asserts "he is actually innocent of the three-act,

three animus kidnapping and only guilty of a single-act, single-animus kidnapping."  (*Id.*)

As noted above, in order to establish actual innocence, a petitioner must support his

allegations of constitutional error with new and reliable evidence that was not presented at trial.

*Schlup*, 513 U.S. at 324; *see also Gulertekin*, 340 F.3d at 427.  Lundy provides no new, reliable

evidence which was not presented at trial.  Rather, he merely reiterates the legal arguments he

alleges regarding the application and constitutionality of Ohio Rev. Code §2941.25.

Accordingly, and for all the reasons set forth above, the Court finds Lundy has failed to

demonstrate the procedural default of the challenge to the constitutionality of Ohio Rev. Code §

2941.25 in Ground Four should be excused on the basis of actual innocence.  It is recommended

this portion of Ground Four be DISMISSED as procedurally defaulted.

### B.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the State
>> court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the

dicta) of the United States Supreme Court. *See Parker v. Matthews*, 567 U.S. 37, 48 (2012);

*Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S.

362, 412 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir.2016); *Ruimveld v. Birkett*, 404

F.3d 1006, 1010 (6th Cir. 2005). Indeed, the Supreme Court has indicated that circuit precedent

does not constitute "clearly established Federal law, as determined by the Supreme Court."

*Parker,* 567 U.S. at 48. *See also Lopez v. Smith*, ⸺ U.S. ⸺, 135 S.Ct. 1, 4, 190 L.Ed.2d 1

(2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme

Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting

*Marshall v. Rodgers*, 569 U.S. 58, 64, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or

if the state court decides a case differently than [the Supreme] Court has on a set of materially

32

indistinguishable facts." *Williams*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.  *See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id.* at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's

ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

### 1. Ground One - *Batson* Objection

In his first ground for relief, Lundy asserts "the trial court committed error in not granting [his] challenge to the peremptory strike of an African[-]American female from the jury."  (Doc. No. 9 at 21.)  Lundy bases his argument on the following: (1) the trial judge "would not even accept the obvious race of the potential jurors;" (2) there have been two Ohio appellate court decisions which established a *prima facie* case of discrimination against the Allen County Prosecutor; and (3) the race-neutral explanations provided by the prosecution for the peremptory challenge were "pretext and ruse."  (Doc. No. 9 at 21-24.)  Respondent contends this claim is meritless.  (Doc. No. 7 at 27-33.)

The Equal Protection Clause of the Fourteenth Amendment commands that "no State shall . . . deny to any person within its jurisdiction the equal protection of the law."  U.S. Const. amend. XIV, § 1.  The Supreme Court long has held that the Equal Protection Clause prohibits states from trying a defendant before a jury from which members of his race purposefully have been excluded.  *See, e.g.*, *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999).  The Court extended this principle in *Batson v. Kentucky*, 476 U.S. 79 (1986), in which it ruled that the Equal Protection Clause precludes a party from using a peremptory challenge to exclude members of the jury venire on account of their race.  *Batson*, *supra*, 476 U.S. at 89.  It explained that "harm from discriminatory jury selection extends beyond that inflicted on the defendant and

34

the excluded juror to touch the entire community.  [Such procedures] undermine public confidence in the fairness of our system of justice."  *Id* at 87.  *See also Miller-El v. Dretke*, 545 U.S. 231, 235 (2005) ("When the government's choice of jurors is tainted with racial bias, that 'overt wrong . . . casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial.'") (quoting *Powers v. Ohio*, 499 U.S. 400, 412 (1991)).

In *Batson*, the Supreme Court articulated a three-step process for evaluating claims when a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. *Id*. at 96-98.  First, the court must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race.  *Id.* at 96-97. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  *Id*. at 97-98.  "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices."  *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)).  Indeed, "[t]he fact that a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions."  *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989).

Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  *Batson*, *supra*, 476 U.S. at 98.  "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent

of the strike.'"  *Rice*, *supra*, 546 U.S. at 338 (quoting *Purkett*, *supra*, 514 U.S. at 768).  In

making this determination, the Sixth Circuit has observed, "the court presumes that the facially

valid reasons proffered by the [party exercising the peremptory challenge] are true."  *Braxton v.*

*Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (quoting *Lancaster v. Adams*, 324 F.3d 423, 433

(6th Cir. 2003)).  The issue, therefore, "comes down to whether the trial court finds the

prosecutor's race-neutral explanations to be credible."  *Miller-El v. Cockrell*, 537 U.S. 322, 339

(2003).  "Credibility can be measured by, among other factors, the prosecutor's demeanor; by

how reasonable, or how improbable, the explanations are; and by whether the proffered

rationale has some basis in accepted trial strategy.'"  *Id.*

      The Supreme Court has emphasized that trial-court findings on the issue of

discriminatory intent must be afforded "great deference."  *See Hernandez v. New York*, 500 U.S.

352, 364-66 (1991).  This makes "particular" sense, it has explained, because

> [t]here will seldom be much evidence bearing on that issue, and the best evidence
> often will be the demeanor of the attorney who exercises the challenge.  As with
> the state of mind of a juror, evaluation of the prosecutor's state of mind based on
> demeanor and credibility lies "peculiarly within a trial judge's province."

*Id*. at 365 (quoting *Witt, supra*, 469 U.S. at 428).  In fact, "[t]he credibility of the prosecutor's

explanation goes to the heart of the equal protection analysis, and once that has been settled,

there seems nothing left to review."  *Id*. at 367.  Thus, the state court's determination of whether

the prosecutor intended to discriminate is a "question of historical fact," which is  presumed

correct unless rebutted by clear and convincing evidence.  *Lancaster v. Adams,* 324 F.3d 426,

429 (6th. Cir. 2003) (citing *Hernandez*, 500 U.S. at 367.).

      Here, Lundy raised a *Batson* claim on direct appeal to both the state appellate court and

the Supreme Court of Ohio.  (Doc. No. 7-1, Exh. 8, 18.)  The state appellate court considered

36

this claim on direct review and rejected it as follows:

{¶ 42} In the second assignment of error, Lundy claims that the trial court erred in allowing the State to use a preemptory challenge to remove an African–American from the jury in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. In *Batson*, the U.S. Supreme Court held that African–American defendants are denied equal protection under the law when they are tried before a jury from which other African–Americans have been purposely excluded. *Id*. "Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, *United States v. Robinson*, * * * the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id*. at 90.

" 'A court adjudicates a Batson claim in three steps.' " *State v. Bryan*, 101 Ohio St.3d 272, 2004–Ohio–971, 804 N.E.2d 433, ¶ 106, quoting *State v. Murphy* (2001), 91 Ohio St.3d 516, 528, 747 N.E.2d 765. "First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson*, 476 U.S. at 96–98, 106 S .Ct. 1712, 90 L.Ed.2d 69." *Id*. Third, the trial court must decide, based on all the circumstances, whether the opponent has proved purposeful racial discrimination. *Batson* at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69.

*State v. Frazier*, 115 Ohio St.3d 139, 2007–Ohio–5048, 873 N.E.2d 1263, ¶ 64. A determination by the trial court that there is no discriminatory intent by the State will not be reversed absent an abuse of discretion. *Id.*

In step three, the trial court may not simply accept a proffered race-neutral reason at face value, but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual. "[T]he rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller–El v. Dretke* (2005), 545 U.S. 231, 251–252, 125 S.Ct. 2317, 162 L.Ed.2d 196. If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. *Id*. at 252, 125 S.Ct. 2317, 162 L.Ed.2d 196.

37

*Id*. at ¶ 65.

{¶ 43} During the voir dire of this case, the State used a preemptory challenge to remove an African–American juror from the jury, leaving the jury with no African–American members. Counsel for Lundy objected claiming a violation of his right to be tried by a jury of his peers pursuant to *Batson*. Counsel pointed out that the only other potential African–American juror was "well down the list." Tr. 138. The State presented the following race-neutral reason.

> [S]ome of the family members that the uh, the juror listed, including—in particular uh, her children's last name is Harmon and her son's name is [A.H.], Junior, who in speaking with Detective Leland and Miss Emerick, our office has prosecuted Mr. Harmon [Sr.] on a number of occasions. He's got many, many criminal things in his past; not to say that she does, but that causes us serious concern about whether she would be fair and impartial from [our] standpoint. Nothing as far as challenging for cause.

> But also again, the name Brownlow, there are a number of Brownlows uh, that the State has prosecuted in the past. I'm sure the Court's aware, particularly Easter Brownlow and Cornelius Brownlow. Again, not necessarily as an indication on the record that she is related to them, but not trying to take that chance, and certainly not wanting to point it out to her uh, embarrass her or anything like that. The State, quite frankly, just doesn't feel comfortable having her as a juror. And it has nothing to do with her race, but her associates.

Tr. 140. The trial court then made a determination that there was no pattern of discrimination as required by *Batson* to shift the burden of proof to the State. Tr. 143. However, the trial court continued and found that even if the burden had shifted to the State, the State had put forth a race neutral reason for the challenge. Tr. 143. The trial court then overruled the challenge. A review of the record indicates that the State did provide a logical, race-neutral reason for the challenge. Thus, we cannot conclude that the trial court's ruling was an abuse of discretion. The second assignment of error is overruled.

*Lundy*, 2014 WL 5803035, at *10-11 (citations omitted).

The Court finds the state appellate court's determination was neither contrary to nor an unreasonable application of clearly established federal law.  As the appellate court correctly noted, the State excused prospective juror Brownlow with their second peremptory challenge

during voir dire.  (Doc. No. 6-1, Tr. 139.)  Lundy's trial counsel subsequently made a *Batson*

challenge, arguing as follows:

> Yes, your Honor, the State of Ohio has used a preemptory challenge to excuse a
> person who was juror number one uh, by the name – if I can pronounce the first
> name LaTavia Brownlow, I believe.  And uh, we're making, at this point, a
> challenge pursuant to *Batson versus Kentucky*.  I think it's obvious, if you're in the
> courtroom, but it's not obvious on the record, that Miss Brownlow is an African-
> American; that of the entire venue that's here I have only been able to detect one
> other uh, African-American female juror who's well down the list.
>
> Understandably that there is a two-step process that the Court has to go through
> and establish in establishing a pattern, it's hard to establish a pattern where you
> only have one potential African-American juror.  But I believe that where a venue
> is so thin of persons of uh, my client's race who also, for the record, happens to be
> African-American, I think a *Batson* challenge is uh, required at this particular
> point in time.  We'd ask the Court to at least require the State of Ohio provide a
> race-neutral reason for excusing that juror.

(Doc. No. 6-1, Tr. 141-142.)

The State asserted no pattern has been established, as the first peremptory challenge was

a Caucasian male.  (Doc. No. 6-1, Tr. 142.)  The State provided a reason for excluding

prospective juror Brownlow, noting her son's father had been prosecuted by the Allen County

Prosecutor's office multiple times and there were several Brownlows in the community who

also has been prosecuted by the Allen County Prosecutor's Office.  (Doc. No. 6-1, Tr. 142-143.)

The state trial court concluded Lundy had not made a *prima facie* case of purposeful

discrimination.  (Doc. No. 6-1, Tr. 146.)  The trial court further ruled even if Lundy had done

so, the State offered a race neutral reason for striking prospective juror Brownlow from the jury,

and overruled the *Batson* objection.  (*Id*.)

39

Lundy argues there is a *prima facie* case of discrimination.[5]  (Doc. No. 9 at 21-22.) However, "once a prosecutor has offered a race-neutral explanation of the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a *prima facie* showing becomes moot." *Hernandez,* 500 U.S. at 359.  *See also Lancaster,* 324 F.3d at 434-35.  Here, while the trial court did not find a *prima facie* case of discrimination, it still considered and accepted the State's race neutral explanation.  (Doc. No. 6-1, Tr. 146.)

As noted *supra*, the state trial court's finding as to the credibility of the prosecutor's explanation is a factual determination which is presumed correct unless rebutted by clear and convincing evidence.  *Lancaster,* 324 F.3d at 429 (citing *Hernandez*, 500 U.S. at 367.).  Lundy fails to provide "clear and convincing evidence" the trial court erred in finding the prosecutor's

---

[5]     Lundy directs this Court's attention to two cases in which the state trial court found a *prima face* case of discrimination against the Allen County Prosecutor. (*Id*. at 22, *See State v. Goode*, 2008 WL 918723 (Ohio Ct. App. Apr. 7, 2008); *State v. Evans,* 2010 WL 3836166 (Ohio Ct. App. Oct. 4, 2010).)  These other cases are irrelevant, as they both dealt with different jury pools.  The mere existence of other *prima facie* cases of discrimination by the Allen County prosecutor does not provide evidence that discrimination was occurring in this instance.  Moreover, in one of the cases cited by Lundy, the State had used peremptory challenges to strike multiple African-Americans from the jury.  *See State v. Goode*, 2008 WL 918723 at *1.  Here, the State had made two peremptory challenges, one for Caucasian male and the other for a African-American female.

Lundy notes the state trial judge "would not even accept the obvious race of the potential jurors in this case." (Doc. No. 9 at 21.)  The Court notes the state trial court did make the comment "it's impossible to determine what racial group people are in, and I think there's some discrimination in making an assumption or saying it's obvious that they're of a racial group or not in this day and age." (Tr. 144-145.) While the trial court's discussion on race lacks clarity, it does not indicate any clear evidence of racial bias.

race neutral explanation credible.  The State maintains it struck Ms. Brownlow from the jury

due to her possible relationship with several individuals who had been prosecuted by Allen

County.  Lundy argues this explanation was "pretextual," but offers no evidence of similarly

situated Caucasian prospective jurors who remained on the jury.

Rather, Lundy argues that because Allen County's racial makeup is only 12% black "if

you start excluding black jurors because they happen to be related to someone the Allen County

Prosecutor prosecuted at some point in the past, as well as black jurors who happen to have the

same last name as someone the prosecutor prosecuted in the past, there will almost never be a

black juror on any Allen County jury."  (Doc. No. 9 at 24.)  However, this argument does not

provide evidence the prosecutor's race neutral explanation was not credible.  The makeup of the

jury pool and the lack of African-Americans in Allen County does not, in and of itself, create a

violation of the equal protection clause each time an African-American is removed from a jury.

*See Hernandez,* 500 U.S. at 361 (finding the possible disproportionate removal of prospective

Latino jurors did not amount to a per se violation of equal protection clause).  Because the

prosecutor provided a reasonable, race-neutral explanation for Ms. Brownlow's removal, it was

within the trial court's discretion to accept this explanation.

Lundy emphasizes the State did not ask any follow up questions of Ms. Brownlow prior

to her removal from the jury.  (Doc. No. 9 at 23.)  It is true the failure to "ask follow-up

questions can undercut the persuasiveness of the averred concern."  *Russell v. Bunting,* 2018

WL 985906 at *8 (6th Cir. Feb. 20, 2018) (citing *Miller-El v. Dretke,* 545 U.S. 231, 250 n.8

(2005).).  However, the "evaluation of the prosecutor's state of mind based on demeanor and

credibility 'lies peculiarly within a trial court's province.'"  *Hernandez,* 500 U.S. at 365 (citing

41

*Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).  At most, Lundy may have identified an area where the prosecutor could have been more thorough in conducting voir dire.  He did not, however, provide "clear and convincing evidence" the trial court's determination was erroneous.  Overall, Lundy has failed to establish the state trial court's decision on the *Batson* objection was contrary to, or involved an unreasonable application of, clearly established federal law.

Accordingly, it is recommended Lundy's First Ground for Relief be denied.

### 2.    Ground Two - Ineffective Assistance of Trial Counsel

Lundy argues trial counsel was ineffective because he "conceded all elements of all offenses to the jury, with the sole exception being a failure to concede identity."[6]  (Doc. No. 1 at 8.)  Respondent maintains the state appellate court considered this claim on direct appeal and reasonably rejected it.  (Doc. No. 7 at 33.)

In order to establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id.*  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise

---

[6]        As discussed *supra*, Lundy's other arguments raised within Ground Two are procedurally defaulted.  (Doc. No. 9 at 16.)

42

would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy.  *Id.* at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

As explained by the United States Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable
> under § 2254(d) is all the more difficult.  The standards created by *Strickland*
> and § 2254(d) are both "highly deferential," *id.*, at 689, 466 U.S. 668, 104 S.Ct.
> 2052, 80 L.Ed.2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct.
> 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is
> "doubly" so, *Knowles*, 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251.
> The *Strickland* standard is a general one, so the range of reasonable applications
> is substantial. 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251.  Federal
> habeas courts must guard against the danger of equating unreasonableness
> under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d)
> applies, the question is not whether counsel's actions were reasonable. The
> question is whether there is any reasonable argument that counsel satisfied
> *Strickland*'s deferential standard.

*Harrington v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (U.S.2011); *accord Kennedy v. Warren*, 428 Fed. App'x 517, 520 (6th Cir. May 3, 2011); *accord Phillips v. Sheldon,* 2014 WL 185777 at * 14-15 (N.D. Ohio Jan. 16, 2014).

Lundy raised this claim on direct appeal to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 7-1, Exh. 12, Doc. No. 7-2, Exh. 18.)  The state appellate court

rejected this claim as follows:

> {¶ 62} Lundy argues that his counsel was ineffective for making the following statements. Lundy claims that counsel basically conceded that the State was telling the truth in their opening statement and cites to the statement. Taken in context, the alleged error was as follows.
>
>> Ladies and gentlemen, there's a reason opening statements aren't evidence because nothing's been presented to you. Let me tell you what I think is gonna come out in this case.
>>
>> About eighty percent of what Ms. Emerick was telling you about uh, [the victim] being attacked uh, about Mr. Hammond being attacked, all that, we're not gonna contest that. This thing happened on June twenty-first of 2012, that's not gonna be contested. Okay?
>>
>> The problem that we have, and what I believe the evidence is gonna show is, it's gonna show the two main things. One, this identification of who the assailant was, was flawed; was only done by one person, and is not reliable. In other words, what I believe the evidence is gonna show is that [the victim's] identification of [Lundy] is not reliable enough for anyone to include [sic] that he was the assailant.
>
> Tr. 198–99. Contrary to what Lundy is arguing, trial counsel did not concede the case to the State. Instead, counsel was arguing that although the victim and Mr. Hammond were attacked, it was not his client who committed the crime. Considering the photos and medical reports concerning the condition of the victim and Mr. Hammond after they were attacked, arguing that they were not attacked would not have been credible. This court has no reason to believe that counsel's statement was not a reasonable trial strategy, and thus was not ineffective representation.
>
> {¶ 63} Lundy also claims counsel was ineffective by conceding the attack in closing arguments. Again, the statements made by trial counsel, when taken in context show a different perspective.
>
>> Obviously, in cases where we have lots of evidence, the State is correct, it does have the burden of proof on all elements. I am not gonna sit here and go through every single element with you because as far as the defense is concerned, not every single element is part of our defense.
>>
>> As Miss Emerick said, there's always those questions, you know, what happened, where did it happen, when did it happen, how did it

44

happen, and the who? And essentially she's right as to almost everything that we're talking about in that scenario, there aren't questions of what happened; there's no question in anyone's mind that [the victim] was raped. There's no question that she got chased through her house, uh, that she got dragged down to the river and raped. There is no question of what happened.

There's no question of where. We all agree where it happened, we all agree it happened where she was living—her house and the riverwalk near then (sic). We all agree as to when, on June twenty-first of 2012. And the means by which it happened, it's pretty obvious from the testimony, okay?

So all those things, we're not sitting up here and telling you, you know, the State didn't—maybe they technically didn't say exact time on the twenty-first of July of 2012, or anything like that. So none of those things are really what I consider important for purposes of the defense. They are, because you have to find everything, we understand that, but if [sic] assists you when you're going through those elements when you deliberate, it's much easier if, in my opinion, if you focus on the issues in places where there is real dispute.

*20 And that is, the who. Okay? That's the dispute in this case, that's it. What we spent three, three and a half, four days doing is debating the who: not really debating, we've been presenting evidence, now we're debating.

Tr. 806–807. Again, the theory of the defense throughout the case was that the State had not proven beyond a reasonable doubt who was responsible for the offense. This was a reasonable trial strategy. The testimony of the officers was that Lundy denied involvement. The defendant's version of events as stated in the PSI was that he was in the area on the way to a friend's home, but he denied committing the crime. At sentencing, Lundy again stated that he was innocent. Given the repeated denial of the defendant as to his involvement, trial counsel's strategy was sound. The record does not indicate that trial counsel was ineffective. The fifth assignment of error is overruled.

*Lundy*, 2014 WL 5803035, at *18-20.

The Court finds the state appellate court's determination that defense counsel's representation was not ineffective was neither contrary to nor an unreasonable application of clearly established federal law.  The United States Supreme Court has emphasized that, in

45

determining whether counsel performed deficiently under *Strickland*, "[w]e begin with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy." *Cullen v. Pinholster*, 563 U.S. 170, 191 (2011) (quoting *Strickland*, 466 U.S. at 689). Indeed, *Strickland* commands reviewing courts to "affirmatively entertain the range of possible 'reasons [defense] counsel may have had for proceeding as they did,'" *Cullen*, 563 U.S. at 196, and "indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 689-90, 692. *See also McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000) ("Strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation.")

Here, in light of the overwhelming evidence the victim was assaulted, kidnapped, and raped, it was reasonable for the state appellate court to determine defense counsel made a strategic decision to base the defense on the identity of the perpetrator. As the state appellate court remarked, defense counsel's theory throughout the trial was the State had not proven beyond a reasonable doubt it was Lundy who was the culprit. Given the physical evidence establishing the victim had been brutally attacked and Lundy's repeated assertions he was not involved, this was a rational strategy.

Lundy also fails to establish prejudice under the second prong of *Strickland*; i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Indeed, had defense counsel denied any rape, assault, or kidnaping occurred in the face of the obvious physical evidence to the contrary, this may have damaged counsel's ability to persuade the jury. Thus,

Lundy cannot establish a "reasonable probability" the result would have been different.  The state appellate court was not unreasonable in concluding defense counsel had chosen a sound trial strategy.

Accordingly, the Court recommends Lundy's Second Ground for Relief be denied.

### 3.    Ground Three – Ineffective Assistance of Appellate Counsel

In his third ground for relief, Lundy argues appellate counsel was ineffective as they "failed to raise meritorious issues, including as described in the *pro se* reopening petition." (Doc. No. 1 at 9.)  In his Traverse, he expands on this argument, asserting appellate counsel failed to (1) "incorporate Mr. Lundy into his appellate representation . . . [and] not forward[ing] the file to Mr. Lundy,"  and (2) "properly address the matter of the trial court rejecting a defense challenge to the late and incomplete provision to the defense of a formal DNA report."[7]  (Doc. No. 9 at 36, 37.)

Respondent argues this ground for relief "fails to meet the requisite level of specificity for pleading and must be dismissed."  (Doc. No. 7 at 38.)  The Court disagrees.  Lundy sufficiently elaborates this ground for relief in his Traverse.[8]

---

[7]    In the Traverse, Lundy notes he had previously argued his appellate counsel was ineffective due to failing to object to the procedure used in the photo lineup for identification and not objecting to "the means of suppression to the failure of the State of Ohio to properly indict."  (Doc. No. 9 at 36.)  However, Lundy concedes both of these arguments are without merit and "would not be sufficiently errant to merit habeas review."  (*Id.*)  The Court will therefore not discuss these arguments any further.

[8]    Lundy also raised the argument his appellate counsel failed to "allege the ineffectiveness of trial counsel for failing to challenge Ohio's merger statute as unconstitutional."  (Doc. No. 9 at 35.)  As noted *supra*, this argument is procedurally defaulted.  The Court will therefore not address this argument on the merits.

47

The Supreme Court has held a defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The two-part test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). An appellant has no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

Lundy further asserts appellate counsel was ineffective due to the failure of appellate counsel to forward Lundy his case file or raise any arguments regarding the admission of the DNA report. (Doc. No. 9 at 36-40.) Lundy raised these claims in his Ohio App. R. 26(B) application. (Doc. No. 7-2, Exh. 24, 27.) The state appellate court rejected them as follows:

> This cause comes before the Court on Appellant's application for reopening direct appeal pursuant to App.R. 26(B).
>
> Upon consideration the Court finds that the additional issues raised in Appellant's application fail to show any genuine issue as to whether he was deprived of the effective assistance of counsel on appeal. App.R. 26(B)(5). *State v. Reed*, 74 Ohio St.3d 534 (1996), applying the analysis of *Strickland v. Washington*, 466 U.S. 668 (1984). See, also, *State v. Bradley*, 42 Ohio St.3d 136 (1989). There were five assignments of error raised on direct appeal that challenged most aspects of the conviction and sentence, including sufficiency and manifest weight of the evidence.
>
> Upon review of the proposed assignments of error set forth herein, we find that appellate counsel was not ineffective for failing to raise these additional issues. Appellant's proposed assignments of error are not supported by the record, extremely speculative at best, or could not even properly be raised on direct

48

appeal.  It was plausible and, in fact, a reasonable tactic to avoid such speculative and/or improper challenges.  App.R.26(B)(5).  Accordingly, the application is not well taken.

It is therefore ORDERED that Appellant's application for reopening direct appeal be, and the same hereby is, DENIED at the costs of the Appellant for which judgment is hereby rendered.

(Doc. No. 7-2, Exh. 25.)

The Court finds the state appellate court's determination that appellate counsels' representation was not ineffective was neither contrary to, nor an unreasonable application of clearly established federal law.  The United States Supreme Court has emphasized that reviewing courts should "affirmatively entertain the range of possible 'reasons [defense] counsel may have had for proceeding as they did,'" *Pinholster*, 563 U.S. at 196, and "indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment."  *Strickland,* 466 U.S. at 689-90, 692.

Here, Lundy had two different attorneys serve as appellate counsel, Mr. Chamberlain and Mr. Short.  (Doc. No. 7-1, Exh. 10, 12.)  As Mr. Chamberlain represented Lundy at trial, the state appellate court appointed new appellate counsel when Lundy sought to raise an ineffectiveness assistance of trial counsel claim.  (Doc. No. 7-1, Exh. 10, 11.)  Thereafter, Mr. Short assumed the role of Lundy's appellate counsel and filed a supplemental brief, adding an ineffective assistance of trial counsel argument.  (Doc. No. 7-1, Exh. 12.)

Lundy asserts his appellate counsel "refused to incorporate [him] into his appellate representation" and "did not forward the file."  (Doc. No. 9 at 37.)  Lundy emphasizes the amount of hours billed by Mr. Short, arguing he "did almost no work to actually handle the appeal."  (Doc. No. 1 at 9, Doc. No. 9 at 37.)  However, Mr. Short became Lundy's appellate

49

counsel after Mr. Chamberlain had already filed a detailed brief to the state appellate court which raised four assignments of error.  (Doc. No. 7-1, Exh. 8.)  Because the state appellate court did not strike this appellate brief, Mr. Short only had to file a supplemental brief with one additional assignment of error.  (Doc. No. 7-1, Exh. 11, 12.)  Given the amount of time Mr. Chamberlain had already spent on Lundy's appeal, it was reasonable for Mr. Short to spend less time on his supplemental brief.

Moreover, Lundy does not specify how he would have proceeded differently with possession of his case file,  or how the outcome would have been different had Mr. Short billed more than 5.6 hours.  (*See* Doc. No. 1 at 9.)  In order to establish ineffective assistance of counsel, Lundy must establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Indeed, even if appellate counsel had billed three times as many hours or provided Lundy with his case file, Lundy fails to establish how this would have changed the outcome of his appeal.

Lundy also asserts appellate counsel was ineffective due to the failure to raise any arguments regarding the trial court's admission of the DNA expert report.  (Doc. No. 9 at 37-40.)  Prior to trial, the State requested the trial court allow the admission of a DNA expert report recently obtained from the Bureau of Criminal Investigation ("BCI") crime lab.  (Doc. No. 8-3 at 1.)  Lundy's trial counsel opposed the request, arguing the admission of this report violated Ohio Crim. R. 16(K),[9] as it was being provided 12 days prior to the scheduled trial date.  (Doc.

---

[9]     Ohio Crim. R. 16(K) provides:

(K) Expert Witnesses; Reports. An expert witness for either side shall prepare a

No. 8-4 at 2, 3.)  The state trial court permitted the State to disclose the expert report, finding the

State had shown good cause for the requested modification under Ohio Crim. R. 16(K).  (Doc.

No. 8-5 at 5.)

On appeal, Lundy's appellate counsel did not raise any arguments regarding the state trial

court's admission of the DNA expert report.  Lundy's appellate counsel did raise manifest

weight and sufficiency of the evidence arguments, which the state appellate court considered

and denied. *Lundy,* 2014 WL 5803035 at *11-14.

The Court finds it was not unreasonable for the state appellate court to determine

Lundy's appellate counsel was not ineffective for failing to raise this issue on appeal.  Prior to

trial, Lundy's trial counsel argued Lundy was prejudiced by the DNA expert report because he

only had 12 days to prepare any challenges to this evidence.  (Doc. No. 8-4 at 8.)  However,

while Lundy's trial date was initially scheduled for September 18, 2012 it was subsequently

moved to August 6, 2013.  (*See* Doc. No. 8-5 at 1, Doc. No. 6-1 at 1.)  This provided Lundy's

counsel with eleven (11) months to prepare his arguments and challenges in respect to the DNA

expert report.  Indeed, Lundy's trial counsel not only conducted a thorough cross examination of

the BCI expert testimony, he also presented his own expert who had conducted independent

DNA analysis.  (Doc. No. 6-3, Tr.198-216, Doc. No. 6-4, Tr. 92-116.)  Thus, it was not

---

written report summarizing the expert witness's testimony, findings, analysis,
conclusions, or opinion, and shall include a summary of the expert's qualifications.
The written report and summary of qualifications shall be subject to disclosure under
this rule no later than **twenty-one days prior to trial**, which period may be modified
by the court for good cause shown, which does not prejudice any other party. Failure
to disclose the written report to opposing counsel shall preclude the expert's
testimony at trial. (emphasis added)

unreasonable for Lundy's appellate court counsel to not raise this issue further, as any arguments regarding prejudice over its admission had been mitigated.

In addition, failure to raise an issue on appeal constitutes ineffective assistance only if there is "a reasonable probability" that the issue would have changed the result of the appeal. *Ivory v. Jackson*, 509 F.3d 284, 294 (6th Cir.2007), cert. denied, 552 U.S. 1322, 128 S.Ct. 1897, 170 L.Ed.2d 765 (2008).  Had Lundy's appellate counsel raised the issue on appeal, it is unlikely the state appellate court would have found the state trial court in error, as it was within the state trial court's discretion to admit the expert report under Ohio Crim. R. 16(K). Moreover, given the appellate court's assessment of the evidence in its rulings on Lundy's manifest weight and sufficiency arguments, it is unlikely this issue concerning the admission of the DNA report would have changed the result of the appeal. Indeed, the appellate court thoroughly discussed the multiple eyewitness reports placing Lundy at the scene of the crime, including the testimony from the victim and her boyfriend.  The Court's sole focus was not on the DNA evidence.  *Lundy*, 2014 WL 5803035 at *12-13.  Thus, Lundy cannot establish a "reasonable probability" the result of his appeal would have been different.[10]

Lundy cannot demonstrate his appellate counsel's omission of this argument on direct appeal either constituted deficient performance or caused him prejudice.  Thus, the state appellate court's determination was neither contrary to nor an unreasonable application of

---

[10]     Lundy argues "the prejudice of not excluding the DNA evidence seems obvious." (Doc. No. 9 at 41.)  However, this is not the inquiry before this Court. Rather, this Court is considering whether Lundy's appellate counsel's failure to raise the issue of the admission of the DNA evidence caused him prejudice, *as to his appeal.* Lundy appears to be arguing "prejudice" in the context the admission of the DNA evidence at trial.

clearly established federal law.

Accordingly, the Court recommends Lundy's Third Ground for Relief be denied.

### 4.    Fourth Ground for Relief: Merger

In his fourth ground for relief, Lundy argues his convictions should have been merged as allied offenses committed with a single animus.  (Doc. No. 1 at 11.)  He asserts "11 years were imposed as a result of the act of which Mr. Lundy was convicted.  The remaining 29 years of his sentence is the result of a trial judge making findings of fact concerning questions of merger." (*Id.*)[11]  Respondent maintains a challenge to "Ohio's determination that his convictions should not merge" is a "non-cognizable challenge to a state law issue."  (Doc. No. 7 at 42, 43.)

The state appellate court considered Lundy's clam on direct appeal and rejected it as follows:

> {¶ 52} The first and fourth assignments of error both have to do with the sentence imposed on Lundy by the trial court. In the first assignment of error, Lundy claims that his convictions should all have merged as allied offenses of similar import. The premier case on the current state of law in Ohio as it relates to merger of allied offenses is *State v. Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314, 942 N.E.2d 1061. In *Johnson*, the defendant was convicted of felony murder and child endangering due to the death of a child in her custody during daycare. The Ohio Supreme Court reviewed the situation and set forth a new test for determining whether offenses were allied offenses of similar import.
>
> > Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of

---

[11]    In his Traverse, Lundy appears to backtrack this argument, arguing the "issue is one of constitutionality," and "Respondant's re-characterization of Mr. Lundy's specifically-worded issue into an issue that would be non-cognizable is a straw man argument that should be rejected as just that."  (Doc. No. 9 at 42.)  However, as discussed *supra*, the argument regarding the constitutionality of Ohio Rev. Code §2941.25 is procedurally defaulted.

the offenses at issue in order to conclude that the offenses are subject to merger.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. *Blankenship*, 38 Ohio St.3d at 119, 526 N.E.2d 815 (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses can be committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic] ). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * *

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

*Id*. at ¶ 47–51. Thus, the first step this court must take is to determine if breaking and entering and attempted theft of a firearm can both be committed by the same act.

{¶ 53} In this case, the State conceded the first part of the test, that it is possible to complete each of these offenses with the same act. Thus, we will not address the first portion of the test. This leaves us with one question: In this case, were all four charges completed with the same conduct and with the same animus? The answer to this question is no.

{¶ 54} The first two counts of the indictment were for rape. One of the charges was for an instance of vaginal intercourse and the other was for an instance of anal intercourse. According to the victim, Lundy first penetrated her vaginally with his

54

penis. When he was done, he told her he was going to rape her anally. He then penetrated her anally with his penis. Since these were two separate acts with separate animus, they are not allied offenses of similar import in this case. Thus, the trial court correctly determined that these charges should not merge with each other.

{¶ 55} The third count of the indictment was a kidnapping charge where Lundy moved the victim by force or threat of force from one location to another for the purpose of engaging in sexual conduct. The evidence in this case indicated that after striking the victim multiple times with his fist, Lundy forced the victim to go into the home. When she escaped, he caught her in Moneer's driveway, struck her again with his fists, and then forced her to walk to a secluded location where he raped her twice. This is not a case where the kidnapping charge stems from the restraint of the victim during the rape. The evidence in this case indicates that Lundy forced the victim from one location to another with the intent to commit a sexual assault. They were separate acts and had separate animus. Therefore, the kidnapping charge does not merge with the rapes.

{¶ 56} Finally, we address the aggravated burglary charge. This offense occurred when Lundy forced his way into the home with the intent to commit a criminal offense. Clearly, this offense was not done at the same time as the two rapes, which occurred on the riverwalk. They were separate and distinct in time and space, and thus were not conducted by the same act and animus. Thus, it does not merge with the rapes. As to the kidnapping charge, the aggravated burglary could be the same act as the kidnapping charge, but it is not necessarily so in this case. If Lundy was charged with kidnapping for forcing the victim into the house with the intent of sexual assault, that may also be an aggravated burglary. However, there are two separate and distinct instance of kidnapping aside from the entry into the home: 1) When Lundy prevented the victim from running to her mother's home and 2) When Lundy forced the victim from Moneer's driveway down to the riverwalk. The jury was not instructed as to which act was the basis of the charges, though multiple instances of attempted escape which were thwarted by Lundy were cited during the State's closing arguments. Without any clear indication that the kidnapping was also the trespass into the house, the jury might just have likely based its kidnapping verdict upon when Lundy prevented the victim from running away before forcing her into the home or when he forced her to leave Moneer's driveway and walk down to the secluded spot on the riverwalk where he raped her. Either one of these two instances would meet the necessary elements to convict Lundy of kidnapping.3 Thus, the record does not clearly indicate that the kidnapping charge is based upon the same conduct as the aggravated burglary charge.

{¶ 57} Since none of the above counts are based upon the same conduct and all were conducted with a separate animus, they are not allied offenses of similar import. Thus, they do not merge for the purposes of sentencing. The first

assignment of error is overruled.

*Lundy*, 2014 WL 5803035 at *14-16.

Challenges to a state court's interpretation and application of state sentencing laws generally are not cognizable in federal habeas corpus.  *See, e.g., Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000); *Kipen v. Renico*, 65 Fed. Appx. 958, 959 (6th Cir. 2003).  However, "[t]he Double Jeopardy Clause protects against . . . multiple punishments for the same offense.'" *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (internal quotation marks and citations omitted).

This multiple-punishments prohibition applies "when the state legislature does not intend for the punishments to be cumulative."  *Volpe v. Trim*, 708 F.3d 688, 696 (6th Cir. 2013) (citing *Albernaz v. United States*, 450 U.S. 333, 334 (1981)).  "In other words, '[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.'"  *Id*. (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)).  Thus, "[w]hen two different statutory provisions authorize punishment for the same act, '[t]he first step is to determine whether [the legislature] intended to punish cumulatively the same conduct which violates two statutes.'"  *Id*. (quoting *United States v. Johnson*, 22 F.3d 106, 107-08 (6th Cir. 1994)).  "'[I]f it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end.'"  *Id*. at 697 (quoting *Ohio v. Johnson*, 467 U.S. 493, 499 n. 8 (1984)).

When assessing a state legislature's intent, federal courts are bound by the state courts' construction of their own statutes.  *Id*.  For purposes of double jeopardy analysis, therefore, "'when evaluating whether a state legislature intended to prescribe cumulative punishments for

a single criminal incident, a federal court is bound by a state court's determination of the legislature's intent.'" *Id*. (quoting *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir.1989) and citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam)). In Ohio, to determine the legislature's intent regarding allied offenses, courts apply Ohio Rev. Code § 2941.25 (Ohio's multiple counts statute). *Id*.

Here, Lundy argues all offenses for which he was convicted "involved one incident," and therefore should have been merged. (Doc. No. 9 at 63.) The state appellate court discussed each of the four counts which Lundy was charged, noting Lundy had raped the victim twice, both vaginally and anally, forced her to walk to a secluded location, and also forced his way into the victim's home. *Lundy*, 2014 WL 5803035 at *15-16. The state appellate court concluded each count was conducted with a separate animus and did not merge for the purposes of sentencing. *Id.* at *16. This analysis conducted by the state appellate court reflects its determination the legislature authorized cumulative punishments for the four offenses in Lundy's case because, under O.R.C. § 2941.25, the offenses for which Lundy was convicted were not allied offenses of similar import and/or that the offenses involved separate conduct or separate animus.

Thus, as the state appellate court applied Ohio's allied-offenses statute consistent with Ohio law, this Court is obligated to defer to the state appellate court's determination Lundy's four counts were not allied offenses subject to merger. *See Jackson v. Smith*, 745 F.3d 206, 214-215 (6th Cir. 2014) ("With the focus correctly on what the Ohio Court of Appeals actually did in this matter—it discerned the Ohio legislature's intent by applying Ohio's allied offenses statute—there can be no doubt that its decision falls outside § 2254(d)(1)'s narrow exceptions to the

bar on federal habeas relief, thus rendering Jackson ineligible for relief.").

Accordingly, because Lundy's Fourth Ground for Relief is not cognizable in a federal habeas proceeding, the Court recommends it is DISMISSED.

### V. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DISMISSED.


Date:  April 18, 2018                                    *s/ Jonathan Greenberg*
                                                          Jonathan D. Greenberg
                                                          United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**